IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JESSICA R. LOCKETT,**     Case 5:14 CV 2520

    Plaintiff,     Judge John R. Adams

    v.     Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.     REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Jessica Lockett filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny child disability benefits ("CDB"), disability insurance benefits ("DIB"), and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated November 17, 2014). For the reasons stated below, the undersigned recommends affirming the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for CDB, DIB, and SSI on July 22, 2011 alleging an onset date of December 11, 2008.[1] (Tr. 95, 106, 119, 131). Plaintiff applied for benefits due to diabetes, diabetic neuropathy, chronic kidney disease, retina damage, acid reflux, and high blood pressure. (Tr. 95). Her claims were denied initially and upon reconsideration. (Tr. 95-140). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 174). Plaintiff, represented

---

1. Plaintiff had previously applied for benefits in 2006 and was denied by an ALJ on July 29, 2009. (Tr. 76). Therefore, *res judicata* dictates that her alleged onset date cannot precede July 30, 2009. (Tr. 14).

by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on July 26, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 11-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on November 17, 2014. (Doc. 1).

**FACTUAL BACKGROUND**

*Personal Background and Testimony*

Born December 11, 1990, Plaintiff was 18 years old as of the alleged onset date. (Tr. 42). She had a high school diploma and at the time of the hearing, a five month old baby. (Tr. 50). She and her son lived with her aunt, uncle, and three other children. (Tr. 59). Plaintiff tried to go to college for about six months in 2010 but had to drop out because of her health problems. (Tr. 61).  She had prior work as a part-time bakery sales clerk and cashier. (Tr. 46-47). Plaintiff testified she was precluded from full-time work because her health often made her call off work. (Tr. 47-48).

Plaintiff stated she had pain in legs, feet, and right hand, issues with her diabetes, depression, and kidney disease. (Tr. 48-49). She said she wears a splint on her right hand to relieve numbness and tingling caused by carpal tunnel and diabetic neuropathy. (Tr. 49). She also stated that at one time her depression and uncontrolled diabetes caused bulimia for over a year. (Tr. 51-52). Plaintiff testified that while the bulimia was resolved, her depression persisted. (Tr. 53). She was not on any medication to control her depression at the time of the hearing although she admitted her depression had worsened after the birth of her child. (Tr. 53-54). While counseling was helping her, her depression still prevented her from concentrating. (Tr. 61, 63). Yet, she noted on a function report that she did well following written and spoken

2

instructions but did not handle job stressors well and would become mildly panicked. (Tr. 294-95).

She also testified her pregnancy caused worsened conditions related to her diabetes and kidney disease, particularly glaucoma, proteinuria, and preeclampsia. (Tr. 54). Plaintiff stated her pregnancy also caused high blood pressure, thyroid issues, and high cholesterol, all of which continued after she gave birth. (Tr. 55). She noted her main symptoms were fatigue, pain and swelling in her legs, and feeling cold. (Tr. 55). In January 2013, Plaintiff stated she began using an insulin pump, which she believed reduced her blood sugar fluctuations and helped her compliance with diabetes treatment regimen. (Tr. 56). She testified when her sugars were too low she was shaky, sweaty, and irritable; and when they were too high she was tired and nauseous. (Tr. 68). At the time of the hearing, Plaintiff was prescribed Gabapentin for neuropathy pain but it made her tired and dizzy. (Tr. 56-57). She was also prescribed Humalog, Lasix, Levothyroxine, Lisinopril, Cartia, Omeprazole, Pravastatin, and iron supplements for anemia. (Tr. 58-59). Plaintiff testified she did not think she could work because of her neuropathy pain, tiredness from her kidney disease, depression, and the frequent need to urinate. (Tr. 66-67).

As for activities of daily living, Plaintiff testified she did some laundry, cooked simple meals, fed her son, cared for her son, could pick him up, changed his diaper, did crossword puzzles, listened to music, talked on the phone, and watched TV. (Tr. 60, 291, 293). She also reported no difficulty with taking her medication, running errands, or performing personal hygiene, except that she needed a bath chair. (Tr. 290-92). However she did state her mobility had lessened and she did not go out for social or church activities. (Tr. 292-94).

*Relevant Medical Evidence*[2]

*Physical*

In June 2011, Plaintiff reported to Summa Health Center that she was checking her blood sugars three to four times a day but her diabetes was still uncontrolled. (Tr. 336). It was also noted that Plaintiff had protein in her urine, bilateral retinopathy, and intermittent tingling in both legs. (Tr. 336). Her physical examination showed she was not in acute distress, had normal blood pressure, no edema, and intact, symmetrical peripheral pulses and sensation. (Tr. 338).

Approximately a month later, Plaintiff returned to the hospital with bilateral leg pain, which she described as hypersensitivity, and random sharp pains. (Tr. 380, 383). She was diagnosed with diabetic neuropathy. (Tr. 383). The next day, Plaintiff was admitted into the hospital by Donald Albainy, M.D., and diagnosed with diabetic ketoacidosis; she was described as both diet and medication non-compliant. (Tr. 393).

In August 2011, Plaintiff was seen at Northeast Ohio Nephrology Associates by Melinda Phinney, M.D., for treatment of her proteinuria, high blood pressure, diabetes, and iron deficiency. (Tr. 463). Upon examination, she was alert, comfortable appearing, with clear lungs, no cynanosis or edema, and normal gait. (Tr. 463). In September 2011, Plaintiff reported worsening fatigue and neuropathy in the legs but her physical examination remained normal. (Tr. 464-65). On October 26, 2011, she underwent nerve conduction testing and an EMG on both legs and her right arm. (Tr. 474). She was diagnosed with axonal peripheral neuropathy and carpal tunnel in her right hand, but there were no findings made as to her lower extremities. (Tr. 474-

---

2. The medical evidence summarized herein is that presented to the ALJ at the hearing. The post-hearing medical evidence Plaintiff submitted with her Brief (Doc. 13) will be discussed with the analysis pertaining to Sentence Six remand.

75). That month her doctor reported that while her diabetes was still poorly controlled there had been improvement in the last months. (Tr. 525).

In December 2011, Plaintiff returned to Dr. Phinney where it was reported her proteinuria levels were down and her hypertension was well-controlled, but her diabetes was uncontrolled and her iron deficiency persisted. (Tr. 504). She was seen later that month at Summa Endocrinology for a diabetes follow-up, the doctor noted her diabetes was improving but stressed the importance of dietary changes and physical exercise. (Tr. 514). In February 2012, Plaintiff was seen by Dr. Phinney who reported decreased proteinuria excretions, well-controlled hypertension, and improved iron levels, yet Plaintiff's diabetes was still poorly controlled. (Tr. 576).

In June 2012, Plaintiff was again seen by Dr. Phinney who recorded that Plaintiff's proteinuria excretions were stable but her blood pressure was elevated due to purging and increased stress. (Tr. 570). Dr. Phinney noted Plaintiff's uncontrolled diabetes and Plaintiff admitted manipulating her insulin medications for attention. (Tr. 570). Plaintiff also reported lower extremity swelling, a new symptom for her. (Tr. 571). Dr. Phinney recommended Plaintiff be admitted for psychiatric care for treatment of her self-induced vomiting. (Tr. 574).

Throughout the summer of 2012, Plaintiff's diabetes control improved slightly, although it was still erratic. (Tr. 570, 587, 590, 593, 599-600). She continued to complain of diabetic neuropathy and retinopathy. (Tr. 600, 603). In September 2012, Plaintiff became aware she was pregnant. (Tr. 620-21). She sought medical assistance related to her diabetic incidents of swelling, neuropathy, glaucoma, and uncontrolled sugars throughout her pregnancy and was eventually hospitalized in January 2013. (Tr. 690-706; 780-980; 1180-1379). Plaintiff was then prescribed an insulin pump in an effort to better regulate her blood sugar, which was successful.

5

(*See* Tr. 1238, 1249, 1256, 1264, 1266, 1375). Her kidney disease, proteinuria, anemia, and depression were also all stable. (*See* Tr. 1238, 1256, 1258, 1261, 1264, 1375). Plaintiff had a C-section to deliver her premature baby on February 28, 2012. (Tr. 673, 681).

After being released from the hospital, Plaintiff returned to Dr. Phinney in March 2013 where it was reported Plaintiff's proteinuria, hypertension, and glaucoma were all improved. (Tr. 1380-81). A month later, Dr. Phinney's office reported stability in her proteinuria, kidney disease, hypertension, and iron deficiency management. (Tr. 1399-1400).

*Mental*

In August 2011, Plaintiff reported to her doctor that she was having panic attacks about twice a week which caused her to hyperventilate and cry; she was referred for a psychological consult. (Tr. 477, 541). On October 31, 2011, Plaintiff was seen at Coleman Behavioral Health by Julie Ainslie, a licensed social worker, where she reported the ability to take care of her personal hygiene, perform household tasks, cook, and shop but reported that she needed more financial resources. (Tr. 544-45). Plaintiff also reported depressed mood, anhedonia, fatigue, nutritional changes, low motivation, constant worrying, panic attacks, and poor sleep. (Tr. 553-54). Ms. Ainslie described Plaintiff as well-groomed, cooperative, and withdrawn with avoidant eye contact, average activity, logical thought processes, intact judgment, average intelligence, and clear speech. (Tr. 555-56). However, Ms. Ainslie did note an impairment in attention/concentration and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 44.[3] (Tr. 556, 558).

---

[3] The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any

Plaintiff followed-up with Ms. Ainslie at Coleman Behavioral Health, where she reported Plaintiff was unkempt, tearful, and withdrawn yet cooperative with clear speech, avoidant eye contact, intact judgment, and logical thought processes. (Tr. 533-35). Plaintiff displayed impairments in memory and attention/concentration but Ms. Ainslie noted her intelligence as above average. (Tr. 534).

Ms. Ainslie completed a mental assessment of Plaintiff in January 2012, where she opined Plaintiff was not able to "sustain even part-time work" because of her medical conditions, depression, and lack of social support. (Tr. 563). Ms. Ainslie concluded Plaintiff would have noticeable difficulties in remembering short or detailed instructions, maintaining attention and concentration for periods of time, sustaining ordinary routines, working with others, responding to workplace changes, and using public transportation to travel to work. (Tr. 562-63). She also concluded Plaintiff had no ability to maintain regular attendance or complete a normal workday or week without interruption from her symptoms requiring an unreasonable number of break periods. (Tr. 562).

Plaintiff returned to Coleman Behavioral on February 2, 2012, where she admitted she "manipulate[s] her health to get attention" and "her intention is to get hospitalized and get away from things." (Tr. 564). At the same time she reported self-induced vomiting and being dropped by her primary care physician for treatment non-compliance. (Tr. 564). However, her mental status exam was largely normal with full affect, cooperative mood, clear speech, logical thought processes, and no cognitive impairment. (Tr. 565).

The next month, Abra Morgan, a professional counselor, met with Plaintiff in the hospital following complications from her diabetes and the pregnancy, mainly uncontrolled blood sugar

---

serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.* at 34.

7

and glaucoma. (Tr. 659, 690-706). She reported Plaintiff was cooperative, had clear speech, logical thoughts, and above average intelligence but avoided eye contact, was unkempt, and had impairments in memory and concentration. (Tr. 659-60). Plaintiff stated she was stressed about her financial and living situations especially with the baby coming but admitted that things had been improving. (Tr. 660). Ms. Morgan met with Plaintiff multiple times in October and November 2012 and her mental status examinations remained largely unchanged. (Tr. 662-63, 665-67, 669-70).

*Consultative Examiner*

At her examination in November 2011, Plaintiff complained of depression and anxiety attacks and stated she had been seeking treatment at Coleman Behavioral Health since October 2011. (Tr. 482). She reported prior suicide attempts but admitted she did not want to die but wanted attention. (Tr. 482). She also reported anhedonia, poor appetite, sleep problems, irritability, fatigue, poor concentration, difficulty thinking, recurrent thoughts, and forgetfulness. (Tr. 482). Despite decreased energy and lack of appetite, she stated she had been dressing, bathing, taking care of hygiene, managing money, going to the store, shopping, and paying bills. (Tr. 482).

Joshua Magleby, Ph.D., stated she was independent in her activities of daily living and was only restricted by lack of funds and fatigue. (Tr. 482). He noted adequate social structure despite somewhat limited social contact and normal functional adaptive skills. (Tr. 482). He also noted Plaintiff was generally composed and appropriate with good ability to understand and comprehend simple language and fair ability to understand complex directions. (Tr. 483). She displayed no overt signs of panic disorder or anxiety at the exam and displayed without agitation or restlessness. (Tr. 483). While her mental processing was mildly slow, her intelligence was

8

estimated to be average with no evidence of diminished capacity or cognitive deficits. (Tr. 484). Plaintiff was assigned a GAF score of 55.[4] (Tr. 357). Overall, her abilities were within the normal range of those to be expected of other adults her age except for being somewhat impaired in her ability to handle day to day work stressors. (Tr. 485-86).

*State Agency Reviewers*

Mel Zwissler, Ph.D., found Plaintiff had mild restrictions in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 100, 106). Because of this Dr. Zwissler limited Plaintiff to three to four step simple repetitive tasks in a static work environment with well-explained changes. (Tr. 102, 114). It was noted that although Plaintiff alleges disability due to depression, "she is able to care for herself independently and is also independent with [activities of daily living]." (Tr. 101). Maureen Gallagher, D.O., limited Plaintiff to occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, and standing or sitting six hours out of an eight hour workday. (Tr. 101, 112-13). She was also limited to no production lines with rigorous pace or strict quotas. (Tr. 102).

On reconsideration, Robyn Hoffman, Ph.D. and Paul Morton, M.D., both agreed with the restrictions from the initial determination and did not alter them. (Tr. 124-129).

*VE Testimony and ALJ Decision*

The VE testified that an individual with Plaintiff's age, education, and work history who is able to perform light work but is restricted to simple, routine, repetitive tasks could not perform Plaintiff's past work. (Tr. 72). However, she could perform the work of routing clerk,

---

4. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.

9

mail clerk, and marker. (Tr. 72). The ALJ added a hypothetical restriction requiring the person to lie down intermittently and/or be closely supervised up to four times per day. (Tr. 72). The VE testified there would be no work for a person with those restrictions. (Tr. 72). Plaintiff's attorney then asked if a person who needed five to ten unscheduled breaks per day was employable; the VE stated she would not be able to perform the identified work without an accommodation from the employer. (Tr. 73).

In August 2013, the ALJ concluded Plaintiff had the severe impairments of diabetes mellitus with neuropathy, chronic kidney disease, and depression and panic disorder; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 17-20). The ALJ then found Plaintiff had the RFC to perform light work except that she must avoid all exposure to workplace hazards, including inherently dangerous moving machinery, unprotected heights, and commercial driving. (Tr. 20). She was also limited to performing simple, routine, repetitive tasks, categorized as SVP one or two, undertaken in a work setting that is static such that it precludes fast pace, strict production or time quotas, has infrequent changes, and ample opportunity for these changes to be explained and learned in 30 days or less. (Tr. 20).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could work in the national economy as a routing clerk, mail clerk, or marker. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) the RFC lacked the limitations opined by Julie Ainslie; (2) the RFC lacked substantial evidence because it did not include a restriction requiring Plaintiff to take an "unreasonable number and length of rest periods"; and (3) the VE testimony was not based on an accurate RFC. (Doc. 13, at 2). Furthermore, the Plaintiff argues this case should be remanded pursuant to Sentence Six because new and material evidence shows she is now disabled. (Doc. 13, at 3). Each argument will be addressed in turn.

***"Other Source" Opinion***

Plaintiff's first assignment of error alleges the ALJ did not have substantial evidence to support the RFC because he did not include limitations opined by Julie Ainslie, LISW-S. (Doc. 3, at 2). In essence, Plaintiff is arguing the ALJ did not properly weigh the opinion of Ms. Ainslie. As a Licensed Social Worker, Ms. Ainslie is classified as an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1).

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions

12

and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Ms. Ainslie opined that Plaintiff would have difficulties maintaining concentration and attention, coping with workplace stressors, and completing a normal work week. (Tr. 562-63). Here, the ALJ particularly addressed Ms. Ainslie's opinion and stated he accorded it little weight because it was inconsistent with both the record as a whole and Ms. Ainslie's own treatment notes. (Tr. 24). Plaintiff's mental status exams consistently showed logical thought processes, fair insight and judgment, and average to above average intelligence. (Tr. 483-86, 555-56, 533-

35, 565, 659-60, 662-63, 665-67, 669-70). Additionally, the record showed Plaintiff was consistently cooperative, not only with Ms. Ainslie but with the other counselors she interacted with through Coleman Behavioral Health and at her consultative examination. (Tr. 483-86, 555-56, 533-35, 565, 659-60, 662-63, 665-67, 669-70). It is true that Plaintiff showed difficulties with concentration and attention and that state agency reviewer, Dr. Hoffman, concurred. (Doc. 13, at 14-15; Tr. 100, 106, 556, 534, 659-60, 662-63, 665-67, 669-70). But these limitations were adequately accounted for in the RFC by limiting Plaintiff to simple, repetitive tasks in a static work environment. It is also true that Plaintiff displayed other abnormal symptomology in her sessions; however it was based upon these symptoms that the ALJ found she had the impairment of depression and panic disorders. Yet that does not automatically mean she is disabled.

Plaintiff also argues since Ms. Ainslie was treating Plaintiff, her opinion is entitled to greater weight; however, this is simply not true. Not only is Ms. Ainslie an "other source" opinion entitled to no deference, but her opinion was given after treating Plaintiff for three months in which time she saw her only three times. *Cf Marrero v. Comm'r of Soc. Sec.*, 2012 WL 7767583, at *10 (N.D. Ohio) (finding an ALJ can limit "other source" opinion weights even when the "other source" provides a longitudinal picture of Plaintiff's condition).  It is clear the ALJ considered both the record and Ms. Ainslie's opinion in making his RFC determination, which is all he was required to do. Thus, the ALJ did not err by assigning little weight to Ms. Ainslie opinion or by not using it as a basis for his RFC.

*RFC*

Plaintiff's second assignment of error alleges the ALJ failed to include a restriction on work that accommodated Plaintiff's difficulties maintaining concentration, persistence, and pace without unscheduled breaks. (Doc. 13, at 15).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. An ALJ must also consider and weigh medical opinions. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

At issue here is only whether the ALJ's RFC determination as pertains to concentration, persistence, and pace was supported by substantial evidence. The ALJ took into account the findings of the state agency reviewers, Drs. Zwissler and Hoffman, Ms. Ainslie's opinion, and the record evidence, both medical and of daily living, when he limited Plaintiff to unskilled, simple, repetitive tasks, without production or time quotas, in a static work environment. (Tr. 20). These RFC limitations are reflective of the record that Plaintiff has difficulty with maintaining concentration, persistence, and pace but not to a work preclusive degree. (*See* Tr. 100, 106, 119, 534, 556, 659-60). For example, Plaintiff was found to have impairment in concentration and attention on multiple occasions (*See* Tr. 534, 556, 659-60) but this is contrasted with her reports she was capable of managing her medication, caring for an infant, and performing household chores and daily hygiene (*See* Tr. 60, 290-94, 482-84).

15

Plaintiff next argues that the RFC is not supported by substantial evidence because it does not include a restriction that Plaintiff will need to take an unreasonable number of breaks. The ALJ's RFC was supported by Dr. Hoffman's conclusion that while moderately limited in her ability to work without breaks, Plaintiff was not significantly limited in her ability to sustain an ordinary routine without supervision, maintain regular attention, follow simple instructions, or complete work at a reasonable pace. (Tr. 127). Even if that single line from Dr. Hoffman's opinion supported Plaintiff's theory that a break restriction was needed, the ALJ is not required to adopt any physician's opinion verbatim. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). The ALJ's RFC decision was supported by substantial evidence in the record, and Plaintiff's disagreement with it is not evidence to the contrary.

*Step Five*

Plaintiff also argues the ALJ erred at Step Five because the hypotheticals she presented to the VE did not accurately represent Plaintiff's abilities. (Doc. 13, at 16). More specifically, the ALJ did not include the limitation that Plaintiff would be required to take an unreasonable number of breaks. (Doc. 13, at 16).

To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence

may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ appropriately accounted for Plaintiff's mental limitations in the hypotheticals posed to the VE. In the hypothetical, the ALJ stated the person could only perform simple, routine tasks in a static work environment with no time or production quotas. (Tr. 72). As addressed above, these limitations were supported by substantial evidence in the record. The only argument Plaintiff makes is that the ALJ should have allowed for unlimited breaks in the hypothetical; however, the ALJ did not find this restriction credible. Again, Plaintiff cannot overcome substantial evidence merely because she disagrees with the ALJ's conclusion that the mental evidence in the record did not support the contention that she needed unlimited breaks. Thus, because the ALJ's hypothetical was based on credible and substantial evidence, it was an appropriate representation of Plaintiff on which the VE could testify and the ALJ could rely.

*Sentence Six*

Plaintiff's final argument is that the evidence submitted in support of this complaint entitles her to a sentence six remand. (Doc. 13, at 17). A claimant must establish two

prerequisites before a district court may order a sentence six remand for the taking of additional evidence. *Hollon v. Comm'r of Soc. Sec*., 447 F.3d 477, 484 (6th Cir. 2001). In particular, a claimant must show: (1) the evidence at issue is both "new" and "material"; and (2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996). The party seeking a remand bears the burden of showing that these two requirements are met. *Oliver v. Sec'y of Health and Human Servs*., 804 F.2d 964, 966 (6th Cir. 1986).

The Sixth Circuit explains "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Hollon*, 447 F.3d at 483-84. Such evidence, in turn, is deemed "material" if "there is a probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with new evidence." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Plaintiff's hearing before the ALJ was on July 26, 2013, and it was more than one year later, on September 18, 2014, that the Appeals Council denied Plaintiff's request for review of her case. (Tr. 3, 40). Therefore, any medical records in existence before that date should have been submitted to the administrative process for review. But they were not and Plaintiff has not given any reason, let alone shown good cause, why that was not done.

Despite this failure, review of the evidence submitted and Plaintiff's brief show that she has not proven the evidence is material to the ALJ's decision such that there is a reasonable probability his conclusion on disability would have been different. *Foster*, 279 F.3d at 357. The evidence shows that Plaintiff's condition did not begin to worsen until approximately a year after the ALJ's hearing and decision.  Prior to that it had remained stable. (Doc. 13-1, at 17; 20-56). Evidence of a deteriorating condition "is not relevant because such evidence does not

demonstrate the point in time that the disability itself began." *Sizemore v. Sec' of Health and Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988) (citing *Oliver*, 804 F.2d at 966). In actuality, there is no evidence that Plaintiff's condition "was deteriorating at the time of the decision of the ALJ." (Doc. 13, at 17). As such, the appropriate remedy is "to initiate a new claim for benefits as of the date the condition aggravated to the point of constituting a disabling disability." *Oliver*, 804 F.2d at 966. Therefore, the undersigned recommends that Plaintiff's request for a sentence six remand be denied for failure to prove the additional evidence was material.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying CDB, DIB and SSI benefits is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed and the request for remand be denied.

      s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).